THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RODNEY DALE BARNHILL, Defendant-Appellant.

Fifth District No. 5—87—0818

Opinion filed September 19, 1989.

Daniel M. Kirwan and John T. Hildebrand, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Terry M. Green, State's Attorney, of Benton (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

Defendant, Rodney Dale Barnhill, entered a plea of guilty but mentally ill to the offense of murder on July 9, 1986, and was sentenced to a term of natural life imprisonment on July 30, 1986. The defendant filed a *pro se* motion to withdraw his guilty plea on August 7, 1986, which was subsequently denied by the court. The defendant appeals.

On appeal, the defendant contends first, that the circuit court did not substantially comply with the requirements of Supreme Court Rule 402(b) (107 Ill. 2d R. 402(b)), when it failed to inquire specifically whether any promises had been made to the defendant to induce his guilty plea; second, that the defendant's plea of guilty but mentally ill was not voluntary and must be vacated as the defendant was promised that if he pleaded guilty he would be sentenced to the Department of Mental Health; and third, that the sentence of natural life imprisonment was excessive. In a supplemental brief filed by the defendant, it is contended that the sentencing statute, wherein a defendant may be sentenced to natural life imprisonment if a court finds that the crime was the result of "exceptionally brutal or heinous behavior indicative of wanton cruelty," is unconstitutionally vague. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b).) Because of the nature of the defendant's contentions, a statement of facts is not recited here, but the necessary facts are given under the discussion of each issue.

Defendant's first contention is that the circuit court did

not substantially comply with the requirements of Rule 402(b) in that the court did not specifically inquire of him as to whether any "promises" had been made which had induced him to plead guilty. Rule 402 provides in pertinent part:

> "In hearings on pleas of guilty, there must be substantial compliance with the following:
>
> ***
>
> (b) *** The court shall not accept a plea of guilty without first determining that the plea is voluntary. *** The court, by questioning the defendant personally in open court, shall confirm the terms of the plea agreement, or that there is no agreement, and shall determine whether any force or threats or any promises, apart from a plea agreement, were used to obtain the plea." (107 Ill. 2d R. 402(b).)

Clearly, the statute itself and the case law require only that substantial and not literal compliance with Rule 402(b) is necessary to fulfill the purpose of the statute. (*People v. Krantz* (1974), 58 Ill. 2d 187, 317 N.E.2d 559; *People v. Clem* (1979), 72 Ill. App. 3d 163, 390 N.E.2d 615.) In determining whether there has been substantial compliance, the entire record may be considered. (*Krantz*, 58 Ill. 2d 187, 317 N.E.2d 559.) After reviewing the entire record in the case *sub judice*, we determine that there has been substantial compliance with Rule 402(b).

At the hearing in which the defendant tendered his plea of guilty but mentally ill, the circuit court advised the defendant that he was charged with the offense of murder and read the charge against him. When asked by the court if he understood the nature of the charges against him, the defendant responded that he did.

The court admonished the defendant as to all the possible penalties for the offense of murder: a term of 20 to 40 years, the term of years for an extended-term sentence, the term of years if consecutive sentences are imposed, and the possibility of a term of imprisonment for the defendant's natural life. The court explained the mandatory release provisions and the considerations involved in a guilty but mentally ill plea, including the differences between a straight guilty plea and the guilty but mentally ill plea. The defendant was advised by the court that it would be the judge who sentenced him and no one else. The court asked the defendant if he understood the possible range of penalties, to which the defendant responded affirmatively.

The court inquired as to the defendant's physical well-being and was told that the defendant received medication for his mental illness but that this medication did not interfere with his functioning. The

court ascertained that the defendant attended high school until the eleventh grade and that he was in the special education program. The defendant could not read or write and had never worked.

The circuit court explained his constitutional rights to the defendant, *i.e.*, that he had a right to a jury or a bench trial, the right to confront and cross-examine witnesses, the right to plead not guilty, the right to have the State prove him guilty beyond a reasonable doubt, and the continuing right to counsel. The defendant stated that he understood his rights.

The circuit court asked the defendant if he was entering his plea of guilty freely and voluntarily. The court also asked the defendant if he were being forced or compelled "in any way" to enter his guilty plea, and the defendant stated that he was not. The court determined that the defendant had been treated well while incarcerated in the county jail.

The court required the State to put on evidence to show that it was the defendant who in fact committed the offense. This evidence was presented through the testimony of John Moore, an investigator for the Franklin County sheriff's department. Moore had investigated the murder and had taken the defendant's statement in which the defendant confessed to the killing. After hearing the testimony, the court asked the defendant if Moore's statement was substantially true, and the defendant agreed that it was. The defendant admitted that he was pleading guilty because he had murdered the 14-year-old victim.

Lastly, the court considered two reports from psychiatrists and one report of a psychologist, who had examined the defendant to determine his mental capabilities. These reports established that the defendant was mentally deficient, *i.e.*, the psychiatrists found that the defendant had a learning disability and possibly borderline mental retardation and the psychologist diagnosed the defendant as mildly mentally retarded and schizophrenic, but that he was capable of understanding the charges against him and able to assist in his defense.

■ The defendant argues that because the court did not ask if "promises" were made to the defendant, as required under Rule 402(b), there was not substantial compliance with the statute and the defendant's guilty plea must be vacated. The record reveals that the court did not use the word "promise" in its questioning of the defendant. But as was noted previously, it is substantial and not literal compliance with Rule 402(b) which is crucial. The following colloquy transpired between the court and the judge at the guilty plea hearing:

"THE COURT: Are you doing this freely and voluntarily?

DEFENDANT: Yes, sir.

THE COURT: You've discussed this matter at length on numerous occasions with your attorney, your family's here today and you've discussed it with your family and you understand that you—you think this is the best thing for you to do under the circumstances that you are now in, is that correct, Mr. Barnhill?

DEFENDANT: I don't really know, I guess it is.

THE COURT: Okay. But you're doing this freely and voluntarily?

DEFENDANT: Yes.

THE COURT: Nobody's forced you to do this or compelled you to do this in any way.

DEFENDANT: No.

THE COURT: This is your decision, in other words.

DEFENDANT: Yes."

This conversation established that the circuit court did inquire of the defendant as to whether he was being forced to enter into the guilty plea and whether it was the defendant's voluntary decision. The statute does not require that a court use the exact words of the statute when it questions a defendant, but only requires that a circuit court determine, through its questioning of the defendant, that no promises or force or threats were used to induce the defendant to plead guilty. From the record in this case, the circuit court properly determined that the defendant's plea of guilty but mentally ill was not made as a result of any promises.

■ This case is analogous to *People v. Woods* (1985), 134 Ill. App. 3d 294, 480 N.E.2d 179, in which the defendant contended that the circuit court never specifically inquired whether any promises were made to the defendant. The reasoning of *Woods* is applicable here, that although failure to comply strictly with Rule 402 is not condoned, each and every deviation therefrom does not require reversal. If, as here, it can be determined upon a review of the record that the defendant's guilty plea was voluntary, then any error in failure to comply strictly with Rule 402 is regarded as harmless error. (*Woods*, 134 Ill. App. 3d 294, 480 N.E.2d 179.) In this case, the defendant's plea was voluntarily made and there was substantial compliance with Rule 402(b); therefore, if, *arguendo*, the court's failure to ask the defendant if he had been promised anything to induce his guilty plea was error, it was harmless.

■ The defendant next contends that his plea of guilty but men-

tally ill was involuntary as his attorney and an employee of the sheriff's department promised him that he would be sent to a mental institution instead of to prison if he pleaded guilty. Rule 402 was adopted for the purpose of having the record reflect that a guilty plea was knowingly and voluntarily made. (*People v. Stewart* (1984), 101 Ill. 2d 470, 463 N.E.2d 677.) If a defendant is thoroughly admonished in accord with Rule 402, a guilty plea is not revocable simply because a defendant subjectively believed that he would receive a certain sentence which was not forthcoming. *People v. Turner* (1983), 111 Ill. App. 3d 358, 443 N.E.2d 1167.

At the hearing on the defendant's motion to withdraw his guilty plea, the only evidence presented by the defendant was his sole statement that he believed that he was going to be sent to a mental institution. The testimony of the defendant was as follows:

"Q[uestion]. What did you believe would be the sentence in this case?

A[nswer]. I believed that I was going to go to a mental institution.

Q. Were any promises given to you that you would be going to a mental institution?

A. Yes, there was.

Q. And who made those promises to you?

A. Carroll Owens [defense counsel] and Captain John Moore.

Q. Mr. Barnhill, what were you promised?

A. They promised me that I would not go to prison, that I needed help, that they wanted me to be in a mental institution."

Defendant also stated that he did not understand the proceedings at his guilty plea hearing. On cross-examination, the defendant testified that he knew who the judge was and who his defense counsel was. The defendant admitted that the judge never told him that any of the possible sentences were to a mental institution. The defendant likewise acknowledged that he had stated that he understood what the judge had said at the guilty plea hearing. When the judge had asked him if he had any questions, the defendant responded that he did not. The defendant denied that he had asked the judge at the guilty plea hearing how long of a sentence he would receive. He later stated he did not remember asking the judge about the length of the sentence. No other evidence was presented at the motion hearing.

In denying the defendant's motion to withdraw his guilty plea, the court stated that it had carefully and extensively admonished the

defendant of his rights at the time the defendant entered his plea of guilty and that the defendant was "articulate, alert, [and] participated very capably in his own defense on the witness stand." The court further found that the defendant had understood his rights and that he had intelligently, voluntarily and freely entered his guilty plea. The court determined that the record did not support the defendant's contention that promises were made to him to induce his guilty plea. We agree with the circuit court that the record negates the defendant's contention that promises were made that would induce his guilty plea.

The circuit court extensively admonished the defendant as to the possible penalties he could receive, ranging from a term of 20 to 40 years to natural life imprisonment. The judge did not state that the defendant could be sent to a mental institution as a possible sentence. This admonishment was sufficient to advise the defendant that he was to be given a prison sentence. Additionally, the defendant's question to the judge, during the judge's admonishments regarding possible penalties, where he asked, "How many years do you think I'll get?" indicated that the defendant knew that he was going to receive a prison sentence rather than being sent to a mental institution. The defendant stated, upon being questioned by the court, that he was not being forced in any way to enter his plea of guilty and that he was doing so voluntarily and freely.

■■ ■ Where, as here, a defendant is thoroughly admonished, a subjective belief regarding the sentence to be received will not make a guilty plea revocable, unless there can be found a reasonable justification for the defendant's mistaken belief. (*People v. Kraus* (1984), 122 Ill. App. 3d 882, 461 N.E.2d 1036.) It is the defendant's burden to show that there is a reasonable justification for his belief. (*Kraus*, 122 Ill. App. 3d 882, 461 N.E.2d 1036; *Turner*, 111 Ill. App. 3d 358, 443 N.E.2d 1167.) We cannot find that the defendant met his burden of proof in this case. The only evidence of a promise made to the defendant was by his own self-serving statements that this was so. No corroboration of this testimony was offered. The defendant's testimony only supports the conclusion that he held an unjustified, subjective belief that he would be sent to a mental institution. Therefore, we find that the defendant's guilty plea was made voluntarily and freely.

■■ Before we consider the defendant's contention that the circuit court abused its discretion in imposing a sentence of natural life imprisonment, we first address the defendant's contention that the language of section 5—8—1(a)(1)(b) of the Unified Code of Correc-

tions is unconstitutionally vague. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b).) The defendant contends that section 5—8—1(a)(1)(b) is unconstitutionally vague as the language of that section is similar to the language of an Oklahoma statute which was found to be unconstitutionally vague in a recent decision of the United States Supreme Court. (*Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853.) This issue was not raised before the circuit court but is raised for the first time on appeal; however, we are not barred from consideration of this issue as a constitutional challenge to a statute may be raised at any time. *People v. Bryant* (1989), 128 Ill. 2d 448, 539 N.E.2d 1221.

 The defendant here contends that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" as used in section 5—8—1(a)(1)(b) to determine whether a term of natural life imprisonment will be imposed for a conviction of murder is unconstitutionally vague both on its face and as applied. We first consider whether the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" is unconstitutionally vague on its face. This contention is inherently a due process argument, for when a statute is unconstitutional on its face, it is because the words used have failed to adequately give notice of the action or conduct proscribed. (*People v. Caffrey* (1983), 97 Ill. 2d 526, 455 N.E.2d 60.) A person is not required to speculate as to the meaning of penal statutes. (*Caffrey*, 97 Ill. 2d 526, 455 N.E.2d 60.) However, impossible levels of specificity are not required in penal statutes, but must convey sufficient warning such that the statute can be understood when measured by common understanding and practices. (*People v. Wisslead* (1985), 108 Ill. 2d 389, 484 N.E.2d 1081; *Caffrey*, 97 Ill. 2d 526, 455 N.E.2d 60; *People v. Khan* (1985), 136 Ill. App. 3d 754, 483 N.E.2d 1030.) The words of a statute are presumed to have their ordinary and popularly understood meanings. (*Caffrey*, 97 Ill. 2d 526, 455 N.E.2d 60.) Additionally, statutes are presumed to be constitutional. (*Caffrey*, 97 Ill. 2d 526, 455 N.E.2d 60.) It is a court's duty to construe a statute so as to affirm its constitutionality and validity, if this can be reasonably done, and if there is doubt about a statute's construction, the doubt is to be resolved in favor of the validity of the challenged statute. *People v. Bales* (1985), 108 Ill. 2d 182, 483 N.E.2d 517.

 Webster's Third New International Dictionary defines "brutal" as meaning: "stemming from or based on crude animal instincts: grossly ruthless; devoid of mercy or compassion; cruel and coldblooded; harsh and severe." (Webster's Third New International Dic-

tionary 286 (1971).) "Heinous" is defined as something which is "hatefully or shockingly evil: grossly bad; [or] enormously and flagrantly criminal." (Webster's Third New International Dictionary 1050 (1971).) The term "cruel" is defined by Webster's as "disposed to inflict pain especially in a wanton, insensate, or vindictive manner; pleased by hurting others; devoid of kindness; given to killing and mangling or to tormenting prey." (Webster's Third New International Dictionary 546 (1971).) These definitions are commonly understood and give the trier of fact sufficient warning and understanding as to the type of murder which qualifies for imposition of a natural life sentence. And, as was stated by the supreme court in *Wisslead*, the myriad kinds of conduct which fall within the purview of the statute need not be particularized for the statute to be constitutional. (*Wisslead*, 108 Ill. 2d 389, 484 N.E.2d 1081.) It would be an almost impossible task for the legislature to particularize the exact circumstances which constitute a brutal and heinous crime; therefore, these words are sufficiently indicative of the type of murder which warrants a sentence of natural life imprisonment and are not unconstitutionally vague on their face.

In support of the defendant's argument that the language of section 5—8—1(a)(1)(b) is unconstitutionally vague, he relies primarily upon *Maynard*. We do not find that *Maynard* is applicable in this case as *Maynard* is a death penalty case where the case *sub judice* is not. It has been held that capital punishment cases are a separate entity from all other cases, *i.e.*, that "the penalty of death is qualitatively different from a sentence of imprisonment, however long." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 305, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) The United States Supreme Court went on in *Woodson* to say:

> "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson*, 428 U.S. at 305, 49 L. Ed. 2d at 961, 96 S. Ct. at 2991.)

Because capital cases have been accorded a more stringent consideration, we cannot consider *Maynard* as guiding in this case.

The analysis for constitutional vagueness was stated by the Supreme Court in *Maynard* as follows:

> "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the

case at hand; the statute is judged on an as-applied basis. [Citations.] Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972)." (*Maynard*, 486 U.S. at 361-62, 100 L. Ed. 2d at 380, 108 S. Ct. at 1858.)

Thus, while capital punishment cases are considered under the eighth amendment (U.S. Const., amend. VIII), to find section 5—8—1(a)(1)(b) unconstitutionally vague, we must determine if the application of the statute to the facts in this case produces an unconstitutional result, *i.e.*, that the provision is unconstitutionally vague on an as-applied basis. (*Maynard*, 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853; *Bales*, 108 Ill. 2d 182, 483 N.E.2d 517; *Wisslead* (1985), 108 Ill. 2d 389, 484 N.E.2d 1081; *People v. Sturlic* (1985), 130 Ill. App. 3d 120, 474 N.E.2d 1.) The defendant has not alleged that his conduct was not exceptionally brutal or heinous and indicative of wanton cruelty. That his conduct came within the scope of the meaning of "exceptionally brutal and heinous behavior indicative of wanton cruelty" is clear from the record.

The evidence presented by the State at sentencing was as follows: Debbie Stone Hildreth testified that she had known the defendant for approximately 13 years. Her acquaintance with him was through church. Her parents and the defendant's parents had been friends, and when she was 17 years old, in October of 1979, her parents and the defendant's parents had a yard sale at the defendant's parents' home. On this occasion, the defendant asked her to bring him a soda from the refrigerator. When Hildreth went inside to do so, the defendant followed. The defendant went to his room and returned with a rope which he used to tie her. The defendant also placed a rag in her mouth. While she was tied up, the defendant "touched her" and "unbuttoned one button on her pants." The defendant was interrupted from his activities by his parents coming inside the house.

In addition to Hildreth's testimony, a presentence investigation report was submitted to the court. Attached to the presentence report was a discharge summary from Alton Mental Health Center. This document stated that the defendant was admitted to this facility on October 2, 1979, and gave the following basis for his admission:

"Client came to [the] hospital accompanied by Marc Goodman, counselor, after he tied his ex-girlfriend down, attempted rape and had thought of killing her but was interrupted by his family."

The diagnosis of the defendant's condition given in the discharge summary was schizophrenia and drug dependence (based on the defendant's history).

The State also presented a transcript of the defendant's taped statement made to John Moore on July 6, 1985. The transcript established that on July 4, 1985, the defendant went to the victim's home to sell her father some cigarettes. While the defendant was at the Boner home, he said hello to Ruth Ann Boner. When the defendant left the Boners' home, he stated that Ruth Ann followed him on her bicycle. According to the defendant, Ruth Ann told him that she was going to her boyfriend's home. The defendant offered Ruth Ann a bicycle and had her follow him to an abandoned house. The defendant admitted that, at the time he offered the bicycle to Ruth Ann, he did not have a bicycle to give her.

At the abandoned home, the defendant had Ruth Ann come inside the house by explaining to her that the bicycle was inside. When they were inside the house, the defendant grabbed Ruth Ann from behind. The defendant stated: "I threw her down on the floor and stuff. Well, I was wanting to have sex with her and stuff, because she teased me quite a few times." Ruth Ann struggled to free herself, and the defendant choked her with his hands. The defendant admitted that, not only did he choke Ruth Ann with his hands but he also placed his foot on her neck. Lastly, he took a wire clothes hanger and garrotted her.

The defendant further stated that he removed Ruth Ann's clothing and that he touched her "chest" and that he inserted his fingers into her vagina. He denied that he had sexual intercourse with her. When the defendant left, he thought that Ruth Ann was still alive.

After the defendant left the victim, he went to his friend's, Greg Wilson's, home but Wilson was not there. He then went to a man named Ron's home, from which he proceeded to Wilson's sister's house, where he sat outside in the yard. He eventually went to his own home. The defendant stated that he did not talk to anyone about the crime as he was ashamed of it.

The following day, the defendant rode around with Wilson and drank beer. According to another statement made by the defendant to the police later on July 6, 1985, the defendant and Wilson burglarized the defendant's sister's home in Belleville on July 5, 1985, the

day after the murder. The record indicated that the defendant's sister's home had been burglarized that day.

The circuit court was also provided with the reports of two psychiatrists and one psychologist at the sentencing hearing. Dr. Thomas Flynn, a psychiatrist, had examined the defendant to determine the defendant's fitness to stand trial. His report indicated that the defendant had drunk beer, Mad Dog 20—20 wine, and that he had taken four Placydils (a sedative), 750 milligrams, on the day of the crime. The defendant told the doctor that he had been drinking since he was 15 or 16 years old. The defendant stated that he also liked to sniff gold spray paint.

When Dr. Flynn asked the defendant if he had ever been in a mental hospital, the defendant advised him that he had been hospitalized at Alton Mental Health Center for tying an ex-girlfriend up and gagging her. He told the doctor he was thinking of killing her when he was interrupted by either her parents or his parents. He was hospitalized for six or seven months and was placed on the medication prolixin at that time. When he got out of the hospital, the defendant returned to his habit of taking drugs and drinking alcohol. In 1983, the defendant was again hospitalized at Alton Mental Health Center for his violent behavior. He remained hospitalized for approximately 1½ months.

Dr. Flynn's mental status examination revealed that the defendant was extremely childish and simple, but that he showed no signs of hallucinations or delusions. The doctor gave as his opinion that the defendant may have mild mental retardation but he did not test for this. He believed that the defendant had a learning disability, a theory which he supported by stating in his report that the defendant had a superb memory, but that the defendant was deficient in learning and education. He diagnosed the defendant as having an alcohol and drug dependence.

The report of Dr. Joseph Shuman, a psychiatrist, stated that the defendant told him that he had gotten drunk, smoked pot and had taken pills on the day of the murder. The defendant admitted to the doctor that, in the past, he had done a lot of stealing to obtain money to buy beer and marijuana. The defendant related the details of the murder to the doctor: he told the doctor he had followed the victim from her home after he had sold some stolen cigarettes to her father; that he offered to give her a bicycle and lured her to an abandoned house with this promise; that he told her the bicycle was inside the house, and when they went inside the house, he grabbed her and threw her onto the floor; that he only wanted to have sex

with the victim, but that she fought him; that the defendant tore the victim's clothing off of her, and because she fought him, he started choking her; that he stood on her neck; that he ultimately placed a coat hanger around her neck; and that after the incident, he sat down on a couch and masturbated.

The defendant admitted to Dr. Shuman that he was afraid of going to jail and that he had attempted suicide while in jail because of his fear. He expressed fear of being sexually assaulted while in prison. He assured the doctor that he would sign a statement if he could be sent to Alton Mental Health Center for life.

The doctor noted that the defendant could not read or write and that he had attended special education classes in school. The defendant stated that he had been going to the mental health clinic in West Frankfort and that he received intramuscular injections of prolixin every two weeks. Since leaving school, the defendant had not worked but just "partied" by taking drugs and by drinking alcohol.

Dr. Shuman administered psychological tests to the defendant. These tests revealed that the defendant was well oriented, that he was borderline mentally retarded, that the defendant had had difficulties during his life due to a learning disability, and that there were "questionable" signs of schizophrenia. The doctor noted that the defendant's alcohol and illegal substance abuse must be included in his diagnosis.

Frederic Golden, a licensed clinical psychologist, examined the defendant at the defendant's request. His testing of the defendant revealed "severe, pervasive chronic psychopathology," which he determined was most consistent with a diagnosis of schizophrenia. Golden also determined that the defendant was mildly mentally retarded. He found the defendant had a reading level of a third grader, an essentially non-reading level. Golden reported that the defendant "apparently" had auditory hallucinations which commanded him to do violent acts.

With the foregoing information before it, the circuit court found that the defendant capably and carefully conceived his crime, that the defendant was 23 years of age at the time of the offense, and that the defendant enticed a mildly hearing disabled young victim to an abandoned house with the promise of a new bicycle. The court determined that the defendant's motivation for the crime was sexual exploitation. The court also stated: "It is also clear that the defendant strangled the victim after disrobing her with his bare hands and a coat hanger and his feet[,] of all things[,] until she was dead." The court found the defendant's actions towards the victim were "excep-

tionally heinous and exceptionally brutal and exhibited wanton cruelty" and imposed a sentence of natural life imprisonment.

We find that the circuit court's determination that the defendant's actions were "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" was supported by the record and that the court did not apply the terms of section 5—8—1(a)(1)(b) in an unconstitutional manner in this case. The defendant's actions appear to have been cold and calculated in that he conceived a plan to lure his young victim to an isolated location. When in the abandoned house, the defendant did not retreat from his purpose when the victim resisted, but he instead strangled her. The defendant's actions of choking the victim with his hands and standing on her neck and ultimately garrotting her with a coat hanger were indicative of cold-blooded behavior, devoid of mercy and compassion and, by these actions, the defendant inflicted pain in a wanton manner, thereby exhibiting brutal and cruel behavior.

Having thus determined that section 5—8—1(a)(1)(b) was not unconstitutionally vague either on its face or as applied, we now address the defendant's remaining contention that the circuit court abused its discretion when it imposed a sentence of natural life imprisonment. The defendant contends that his sentence of natural life imprisonment was an abuse of discretion when his age (he was 23 years of age at the time of the commission of the crime), his drug and alcohol abuse, his poor social or family background, his mental illness, and his negligible criminal history are considered. He argues that with a sentence of natural life imprisonment, he cannot possibly be restored to useful citizenship and that the circuit court did not consider his rehabilitative potential.

Before addressing the merits of the defendant's contention, we note that both the State and the defendant, in their briefs, state that the defendant waived this issue as he failed to include this issue in his motion to withdraw his guilty plea. We do not find that the defendant waived this issue. The defendant filed a timely *pro se* motion to withdraw his guilty plea, and it is true that the defendant failed to raise the issue of excessive sentence in this motion. However, while a motion to withdraw a guilty plea is a prerequisite to an appeal, a defendant does not need to seek modification or reduction of his sentence in that motion to preserve this issue for review. *People v. Ulmer* (1987), 158 Ill. App. 3d 148, 510 N.E.2d 1296; *People v. Joy* (1987), 150 Ill. App. 3d 310, 501 N.E.2d 1325.

The standard for reviewing a sentence imposed by the circuit court is whether the court abused its discretion, and if a re-

viewing court determines that there has been no abuse of the court's discretion, the sentence cannot be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) A proper sentence is the result of a reasoned judgment based upon the circumstances of each case, and a circuit court judge is in a better position than a reviewing court to determine the appropriate punishment. (*Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882.) In fashioning an appropriate sentence, a court considers a defendant's "credibility, demeanor, general moral character, mentality, social environment, habits, and age." (*Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) In addition to these factors, a court must impose a sentence which takes into account the seriousness of the offense and the rehabilitative potential of the defendant. (*Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882.) Because of the responsibility and the delicate balancing of these considerations in imposing a sentence, a circuit court's determination of an appropriate sentence is accorded great deference and weight. *Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882.

■■■ Turning to the merits of the defendant's issue, he claims that his youth and his rehabilitative potential must be considered when imposing a sentence; however, these factors are not the sole factors to be considered. (*People v. Generally* (1988), 170 Ill. App. 3d 668, 525 N.E.2d 106.) Also to be considered are the nature of the crime, the protection of the public, deterrence and punishment. (*Generally*, 170 Ill. App. 3d 668, 525 N.E.2d 106.) In this case, the court stated at the sentencing hearing that it considered the evidence presented at the hearing, the documents on file, the arguments of counsel, and the defendant's statement to the court. As noted previously, the evidence presented at the sentencing hearing consisted of the testimony of Debbie Hildreth, the reports of two psychiatrists and one psychologist, a transcription of the defendant's taped statement, and the presentence investigation report. This evidence revealed that the defendant, while mentally deficient, was still capable of understanding the criminality of his conduct. It was also established that the defendant had never worked and was incapable of doing so, and that the defendant drank and took illegal drugs even though he took medication to stabilize his mental illness. The presentence report showed that the defendant had a prior conviction for a felony theft for which he received probation. At the time of the commission of the murder, the defendant was still on probation for this offense. The record also contained evidence that the defendant committed a residential burglary the day after the murder; however, the disposition of this crime was not given.

The circuit court, at the sentencing hearing, stated:

"He [the defendant] was 23 years of age at the time the offense was committed; he selected a young victim who was mildly disabled with a hearing disability of some sort. He was able to select an abandoned house in an isolated area of the community; he enticed the young girl into this situation by promising her a new bicycle. His motive was the sexual exploitation of Ruth Ann Boner in some fashion, the precise nature of which is unclear from the evidence. It is also clear that the defendant strangled the victim[,] after disrobing her[,] with his bare hands and a coat hanger and his feet[,] of all things[,] until she was dead. It is obvious from this evidence that Mr. Barnhill has dangerous propensities, and it is necessary to protect the public from further criminal conduct by him. It is also necessary to deter others from committing similar offenses."

Clearly, the court found that the defendant had enough presence of mind to conceive the murder and to execute it. The defendant knew that he had committed a criminal act and did not discuss the murder with anyone after he committed it. Instead, the day after the murder, he drank alcohol and committed another crime. The evidence of the murder supported the court's finding that the murder was brutal and heinous. Therefore, we find that the circuit court did not abuse its discretion in imposing a sentence of natural life upon the defendant.

For the foregoing reasons, we affirm the judgment of the circuit court of Franklin County.

Affirmed.

RARICK and HOWERTON, JJ., concur.