THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRIAN McDONALD, Defendant-Appellant.

First District (3rd Division)   No. 1—86—2531

Opinion filed November 1, 1989.

Paul P. Biebel, Jr., Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Renee Goldfarb, and Sara Dillery Hynes, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Brian McDonald, was convicted by a jury of the aggravated battery and murder of his four-year-old stepdaughter, Nicole, and the aggravated battery of his two-year-old stepdaughter, Danielle. He was sentenced by the trial court to an extended term of 60 years for the murder of Nicole and a concurrent term of seven years for the aggravated battery of Danielle. He appeals his conviction for murder and the sentence imposed thereon.

The offenses in this cause relate to occurrences in February and May 1985. However, only the May occurrences are relevant to this appeal. On May 3, 1985, Nicole and Danielle were in good health while at their baby-sitter's residence. As was his custom, defendant picked the girls up after work. As was her custom, Danielle cried when defendant picked her up. Defendant admitted at trial that he slapped Nicole in the face on the way home from the baby-sitter's because she wet her pants and because he suspected her of bruising Danielle's cheek. When defendant arrived home with the girls, defendant's wife and the girls' natural mother, Kathy McBride, noticed a bruise on Nicole's temple. When Kathy questioned defendant about the bruise, he told her that it must have happened at the baby-sitter's. When Kathy asked Nicole about the bruise, the child covered her mouth and looked scared. At this time, Nicole was also looking at defendant, who was standing in the doorway while Kathy was talking to Nicole.

On May 4, 1985, a Saturday, Kathy had to work. Defendant remained home with the girls. When defendant served them breakfast, Danielle spit her cereal out. Defendant admitted hitting her in the mouth for doing so. Later, defendant questioned Nicole about the bruise on Danielle's face, which he had seen the night before, and "asked her why she was doing the things that apparently had been going on, because [he] was getting blamed for a lot of it." When Nicole repeatedly said that she was sorry, defendant said "I know you are sorry, but why, what is happening, what is going on[?]" Defendant then took Nicole by the arm and hit her twice on the side of her stomach. Defendant stated that he may have raised her off the floor as he struck her. Nicole then fell to the floor "right in front of" a dresser and struck her head. Kathy stated that the defendant called her at work at about 11 o'clock and told her that Nicole had run into a

dresser and had a bruise on her back. Kathy also talked to Nicole, who said she was fine. Defendant admitted that during the day, however, Nicole complained that the side of her stomach hurt and that she threw up some soda pop he had given her.

Moreover, after Nicole's death, defendant allegedly admitted to the police that Nicole had not hit her head on a dresser as he claimed. He told the police that he picked Nicole up as high as his head after striking her in the stomach and threw her straight down to the floor. He also told the police that Nicole may have landed on her head.

When Kathy came home from work, she noticed that Danielle had a bruise under each eye, that her eyes were blackened, that her nose was discolored and swollen, her lip was cut and her hair was up in a pony tail. Kathy asked defendant about Danielle's injuries, and defendant stated that, when he went into the bedroom to get the kids in the morning, he noticed that Nicole had kicked Danielle in her sleep. Defendant testified to the same effect. Kathy stated that defendant had not mentioned Danielle's injuries when he called her at work. Kathy then checked on Nicole, who was lying very still in bed, next to a bucket of green vomit, and noticed that she had a bruise on her back. Defendant made some strawberry margaritas and took Kathy into their bedroom.

The next day, Nicole threw up aspirin which Kathy, thinking she had the flu, had given her. Kathy told defendant she wanted to take Nicole to the doctor but defendant said the child just had a bad flu. Later, Kathy decided to take Danielle to a family barbecue. When she took Danielle's hair out of the ponytail to fix it, Kathy noticed that she had two patches of hair about an inch and a half in diameter missing from her head. The hair appeared to have been pulled out. Kathy did not notice any hair missing from Danielle's head when her hair was down on Saturday morning. Defendant told Kathy he did not know what had happened to Danielle's hair.

When Kathy returned from the barbecue with Danielle, she asked defendant what he was doing to the girls. He responded that he was not doing anything to them and that Kathy's family was "feeding [her] information, putting the blame on [him]." Later, when Kathy was getting Danielle ready for bed, she heard Nicole, who had been on the couch earlier, scream. Kathy ran into the living room and found defendant standing over Nicole, who was crying. When Kathy told him to leave Nicole alone and to leave the room, defendant said he was not doing anything to Nicole. Kathy returned to Danielle in the bedroom and then heard Nicole scream again and say "don't hurt me." When Kathy returned to the living room, she again found

defendant standing over Nicole. Defendant again denied doing anything to the child. After defendant left the room, Nicole told Kathy that her stomach hurt. During the remainder of the evening, Nicole was very quiet.

When Kathy awoke the next morning and found Nicole still very quiet, she called her mother, who called the paramedics. Before the paramedics arrived, Kathy gave Nicole an alcohol sponge bath, in hopes of reducing her fever. When Kathy gave Nicole the sponge bath, Nicole was lifeless. The paramedics arrived shortly after Kathy's mother, who had tried to revive Nicole with mouth to mouth resuscitation. The paramedics pronounced Nicole dead. Thereafter, they transported Nicole's body to Edgewater Hospital.

Police officers were assigned to investigate Nicole's death almost immediately. Detective Richard Mariner viewed Nicole's body at the hospital. He noted the following injuries to Nicole: a large bruise on the left cheek; a blackened left eye; a quarter-inch laceration near the left side of her jaw; a large bruise at the waist, in the center of the left lower back; bruises on and around the left elbow; a bruise to the right elbow, a bruise on the right shin; and dried blood in both nostrils.

Opinion

On appeal, defendant first contends the State denied him a fair trial by failing to tender to the defense a copy of an abuse and neglect petition allegedly pending "against" Kathy at the time of trial. Defendant notes his discovery request for information of any State action pending against any of its witnesses. Defendant argues that if he had known of the petition, he could have argued Kathy's bias to the jury. Relying on the fact that the jury had been instructed on the offense of involuntary manslaughter and the jury's recommendation during its deliberations that manslaughter charges be considered against Kathy, defendant asserts that knowledge of the petition may have convinced the jury to convict him of manslaughter rather than murder.

■ We cannot agree with defendant that the petition for adjudication of wardship of Danielle was encompassed within his discovery request for disclosure of any criminal or civil action involving the State and pending against any of its witnesses. An adjudication of wardship, like all proceedings under the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—1 *et seq.*), is not intended to be an adversary proceeding (Ill. Rev. Stat. 1985, ch. 37 par. 701—20). As such, it is not brought against anyone but, rather, is brought only in the best

interests of the child or children involved. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 340, 379 N.E.2d 872.) Therefore, it was not brought *against* Kathy in the sense in which that term was used in plaintiff's discovery request.

*People v. Redmond* (1986), 146 Ill. App. 3d 259, 496 N.E.2d 1041, did not require disclosure of the subject petition. *Redmond* held that the defendant was entitled to a post-conviction evidentiary hearing regarding the State's failure to disclose, *inter alia*, an adjudication of delinquency against its sole identification witness. In reaching its decision, the *Redmond* court noted that such adjudications are, like probationary status and pending criminal charges, admissible at trial for impeachment. (*Redmond*, 146 Ill. App. 3d at 263, citing *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105; *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852.) Here, defendant cites no authority supporting the contention that adjudications of wardship may be used to impeach the parent involved.

Defendant next contends that, if we find that he waived the argument regarding the wardship petition or that defense counsel had constructive notice of the petition, we must also find defense counsel's failure to investigate the matter to constitute ineffective assistance of counsel. As we have found defendant's argument relating to the petition for adjudication of wardship meritless on grounds other than those anticipated by defendant and unrelated to the effectiveness of defense counsel, we need not address this argument.

Defendant next contends the trial court denied him a fair trial when it allowed the jury to view, during its deliberations, certain photographs of Nicole taken after her death, although it had previously ruled that the jury would not be allowed to view any such photographs. Defendant asserts that the trial court's changed ruling denied him the opportunity to discuss the crucial evidence of the photographs in his closing argument and thereby effectively denied him the right to present such argument. We cannot agree.

Initially, we note that, contrary to defendant's contention, the trial court did not rule that the photographs of Nicole taken after her death would not go to the jury. Rather, after the trial court decided to allow certain photographs to go to the jury, the State withdrew its request therefor and requested only that a diagram of Nicole's injuries go to the jury, which request the trial court granted.

■ More importantly, the decision as to which evidentiary items, including photographs, may go to the jury during its deliberations is within the sound discretion of the trial court and will not be disturbed absent a showing of prejudicial abuse. (*People v. Treece* (1987), 159 Ill.

App. 3d 397, 511 N.E.2d 1361.) Moreover, photographic evidence having a natural tendency to establish facts in controversy is admissible in evidence and thus may properly be viewed by the finder of fact. (See *People v. Williams* (1983), 97 Ill. 2d 252, 290, 454 N.E.2d 220, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) We believe that the photographs which the trial court allowed the jury to view during its deliberations were probative of and relevant to both offenses against Nicole with which defendant was charged, *i.e.*, murder and aggravated battery.

*Herring v. New York* (1975), 422 U.S. 853, 45 L. Ed. 2d 593, 95 S. Ct. 2550, cited by defendant, holds only that a total prohibition of closing argument is a violation of constitutional rights. No such total prohibition occurred here. Defendant cites *People v. Guyon* (1983), 117 Ill. App. 3d 522, 453 N.E.2d 849, for the proposition that a criminal defendant has an absolute right to present closing argument. However, *Guyon* merely notes that the character and scope of closing argument are within the discretion of the trial court. *Guyon*, 117 Ill. App. 3d at 533-34.

Moreover, it is axiomatic that a criminal defendant is entitled to a fair trial, not a perfect one (see, *e.g.*, *People v. Jackson* (1986), 145 Ill. App. 3d 789, 495 N.E.2d 1359), *i.e.*, one totally free of error (*People v. Jones* (1983), 119 Ill. App. 3d 615, 456 N.E.2d 926). It is implicit in this rule that the fairness of a trial is determined from the record as a whole, not isolated instances of alleged error. So viewing the record here, we believe that defendant received a fair trial notwithstanding the error alleged. Defendant had the opportunity to cross-examine the State's witnesses with regard to the subject photos of Nicole, her injuries and cause of death. This opportunity sufficiently protected defendant from any prejudice which might have resulted from the jury's viewing of the subject photographs, despite defense counsel's decision not to discuss them in his closing argument because the State did not request that they go to the jury.

Finally, in view of the overwhelming, albeit circumstantial, evidence of guilt, any error in allowing the jury to view the subject photographs did not so prejudice defendant as to entitle him to a new trial. We do not believe that a trial free of the error alleged would have resulted in a different verdict.

Defendant next contends that the trial court abused its discretion in sentencing him to an extended term of 60 years for the murder of Nicole. The trial court found defendant eligible for the death penalty under section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)). Specifically, it found that Nicole was un-

der the age of 12 and that her death resulted from exceptionally brutal and heinous acts by defendant which were indicative of wilful and wanton cruelty. The trial court did not sentence defendant to death, however, because it also found certain mitigating factors. After noting that defendant's exceptionally brutal and heinous behavior indicative of wanton cruelty also allowed it to sentence him to an extended term, the trial court imposed an extended 60-year term "[u]nder all the attended [*sic*] circumstances, the record" and defendant's statement to the court.

■ We can disturb a trial court's sentencing determination only if it abused its discretion in that regard. (*People v. Hicks* (1984), 101 Ill. 2d 366, 375, 462 N.E.2d 473.) As defendant notes in his brief, all penalties must be determined according to the seriousness of the offense and with the objective of rehabilitating the defendant. (Ill. Const. 1970, art. I, §11.) However, we do not believe that, as defendant implicitly argues, rehabilitation is paramount to the seriousness of the offense as a factor in imposing sentence. Rather, the trial judge determines the weight to be accorded the appropriate factors, including the goal of rehabilitation, by balancing them in the exercise of his sentencing discretion. (See *Hicks*, 101 Ill. 2d at 375.) We do not believe the trial court abused its discretion to the extent that the sentence imposed may reflect a greater emphasis on the seriousness of defendant's offense than on the goal of rehabilitation.

■ Nor do we find any merit in defendant's contention at oral argument that the trial court abused its sentencing discretion because his conduct was not *exceptionally* brutal and heinous. In so arguing, defendant ignores that the fact that Nicole was under 12 years old alone supported the imposition of an extended term under sections 5—5—3.2(b)(3)(i) and 5—8—2(a)(1) of the Unified Code of Corrections. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2(b)(3)(i), 1005—8—2(a)(1).) As such, he was not prejudiced by the trial court's determination that his conduct was exceptionally brutal and heinous.

Defendant lastly contends that the trial court's consideration of the testimony of Nicole's parents, Kathy McBride and Michael Spight, Nicole's natural father, regarding the impact of her death upon them during the evidentiary phase of the sentencing hearing, requires reversal of the sentence imposed. Defendant's argument is bottomed on *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, although he does not rely directly thereon. *Booth* held unconstitutional the admission of victim impact evidence at a capital sentencing hearing before a jury. We disagree with both parties' apparent position at oral argument that *Booth* does not directly apply here.

However, we also conclude that *Booth* does not require vacatur of defendant's sentence. At oral argument, both sides seemed to agree that *Booth* is inapplicable because, unlike the situation therein, defendant did not receive the death penalty and this was, thus, not a capital case. Unlike the parties, we do not believe that the ultimate fact whether or not a defendant is sentenced to death determines whether a case is a capital case for purposes of judging the admissibility of victim impact evidence.

Rather, after *Booth*, we believe that a case and sentencing hearing must be defined as capital where a defendant has been charged with and convicted of an offense punishable by death, *i.e.*, murder in Illinois (Ill. Rev. Stat. 1985, ch. 38, par. 9—1), and the State has previously expressed an intent to seek that penalty upon conviction (see *People v. Holmes* (1974), 19 Ill. App. 3d 814, 313 N.E.2d 297).[1] Where both requirements are met, the fact that the court or jury either does not find one of the statutory aggravating factors necessary to make a defendant eligible for the death penalty or, as here, finds at least one mitigating factor precluding the death penalty (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) cannot change the character of the case from capital to noncapital.

If a sentencing hearing were not defined as "capital" until a court or jury either found a defendant, convicted of murder, eligible for the death penalty or until it actually imposed the death penalty, *Booth* would not prohibit the admission of victim impact testimony at the evidentiary phase of the hearing. However, every sentencing hearing ultimately resulting in either of those findings would then be transformed into a capital sentencing hearing. As a result, every such sentencing hearing would face reversal under *Booth*. To avoid that infirmity, *Booth* requires that the trial court or jury deciding a defendant's sentence must fail to find him eligible for the death penalty or must fail to impose the penalty, *i.e.*, a case must be determined to be noncapital, *before* victim impact testimony may be properly admitted at a sentencing hearing (Ill. Rev. Stat. 1985, ch. 38, par. 1406).

Here, defendant was charged with and convicted of murder. Before trial, the State expressed its intention to seek the death penalty. Although instructed on involuntary manslaughter as well as murder, the jury convicted defendant of murder. Thus, defendant was charged with and convicted of a capital crime, and his sentencing hearing was capital in nature. However, the victim impact testimony

---

[1]This discussion assumes that a defendant is not exempt from the death penalty due to such factors as minority or insanity.

of Nicole's parents was admitted at the evidentiary phase of the sentencing hearing before the trial court determined whether or not defendant was eligible for the death penalty. This procedure violated *Booth.*

The procedural violation of *Booth* notwithstanding, we cannot reverse defendant's conviction. In *People v. Simms* (1988), 121 Ill. 2d 259, 520 N.E.2d 308, which extended *Booth* to a capital sentencing hearing before a trial court, the trial court had indicated that the impact on the victim's family was a consideration in its sentencing decision. The *Simms* court seemingly interpreted *Booth* as establishing a *per se* rule that "the Eighth amendment prohibits a capital sentencing jury from considering victim impact evidence." (*Simms,* 121 Ill. 2d at 274.) The court thus refused to find the admission of such evidence at a capital sentencing hearing to be harmless error. In so doing, the court noted that the State had not met its burden of proving beyond a reasonable doubt that the error had not affected the trial judge's decision to impose a death sentence. *Simms,* 121 Ill. 2d at 274-76.

However, the supreme court has not adhered to former Justice Simon's construction of *Booth* in *Simms.* In *People v. Crews* (1988), 122 Ill. 2d 266, 522 N.E.2d 1167, *cert. denied* (1989), ___ U.S. ___, 106 L. Ed. 2d 605, 109 S. Ct. 3260, the court rejected a *Booth* challenge to a death sentence by concluding that the admission of victim impact evidence at the sentencing hearing was harmless error. The court based its conclusion on the finding that, as the trial judge did not rely on the evidence in imposing sentence, it played no part in his sentencing decision. (*Crews,* 122 Ill. 2d at 288.) In *People v. Phillips* (1989), 127 Ill. 2d 499, 538 N.E.2d 500, the court again rejected a *Booth* challenge to a death sentence imposed by the trial court. Absent an express indication in the record that the trial court considered the improperly admitted victim impact evidence, the court found nothing in the record to rebut the presumption that the trial court considered only competent and reliable evidence in imposing sentence. Moreover, the court declined to presume that the trial court did consider the improper evidence. Finally, the court found that, given the applicable presumption, any error in admitting the victim impact evidence was harmless. *Phillips,* 127 Ill. 2d at 537.

In this case, the trial court noted its consideration of, *inter alia,* the victim impact statements of Nicole's parents after it had found defendant eligible for the death penalty. The trial court then found mitigating factors precluding a death sentence. The trial court then noted that its finding of exceptionally brutal and heinous conduct indicative of wanton cruelty, which, in part, made defendant eligible for

the death penalty, also allowed it to sentence him to an extended term. Thereafter, the trial court sentenced defendant "[u]nder all the attended [*sic*] circumstances, the record and [defendant's] statement" to a 60-year extended term.

■ Beyond the fact that it did not impose the death penalty, the trial court in this case did not expressly rely on the victim impact statements of Nicole's parents in imposing sentence. As such, this case is distinguishable from *Simms* and is controlled by *Crews* and *Phillips*. That is, absent an express indication in the record to the contrary, we must presume that the court considered only the competent sentencing evidence. We cannot, as defendant urges us to do in his supplemental brief, presume the contrary. In the fact of the applicable presumption, we must find any error in admitting the victim impact testimony harmless beyond a reasonable doubt.

For all of the foregoing reasons, the murder conviction of defendant Brian McDonald and the sentence imposed are affirmed in their entirety.

Affirmed.

RIZZI and WHITE, JJ., concur.