THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DUANE PAGE, Defendant-Appellant.

Third District   No. 3—89—0067

Opinion filed January 18, 1990.

468

Michelle A. Zalisko, of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Edward Burmila, State's Attorney, of Joliet (Rita Kennedy Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

A jury convicted the defendant, Duane Page, of murder and armed robbery (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(3), 18—2(a)). Following a death sentence hearing, he was sentenced to an extended term of 85 years' imprisonment for the murder conviction and a con-

current term of 30 years' imprisonment for the armed robbery conviction. The defendant appeals.

The record reveals that the victim, Robert De Young, was employed as a limousine driver. On January 11, 1988, he received a message from a man requesting transportation. The man stated that his name was Larry King, his address was 216 Eastern Avenue in Joliet, and his telephone number was 727-5596. De Young left his house about 5:30 p.m. in a black limousine to pick up his passenger. About 7:12 p.m. on the same evening, De Young's body was discovered at A.F. Hill Park. He had died from two gunshot wounds to the head. The defendant's fingerprints were found on the window between the driver and passenger compartments, and on the rear passenger door of the limousine.

Dennis Soucie, an investigator for the Will County sheriff's department, testified that Brian Page, Arthur Newell, and the defendant were arrested at the defendant's parents' house in Joliet. The defendant gave his address as 216 S. Eastern in Joliet and his telephone number as 727-5596. On January 12, 1988, the defendant waived his constitutional rights and agreed to give a statement to the police. According to Soucie, the defendant stated that on January 11, 1988, he was riding in a limousine with Page, Newell, Joe Robinson, and two other black males he did not know. Eventually, one of the passengers instructed the driver to stop in A.F. Hill Park. The defendant told Investigator Soucie that after the vehicle parked, he got out to urinate and then left the area because he felt something bad was going to happen. When he got to Rosalind Avenue, he heard what he thought were several gun shots. Looking toward the park, he saw Page and Newell running toward him. Newell had a gun and told the defendant that he had shot the driver.

Michael Swearengen, an investigator for the Will County sheriff's department, testified that he had assisted Soucie with the defendant's interview. According to Swearengen, about 12:30 a.m. on January 13, he and the defendant reviewed the statements the defendant had previously made to Investigator Soucie. The defendant reiterated that he had gotten out of the limousine in A.F. Hill Park to urinate. He then said to Swearengen: "If I told you what happened, I would be 80 years old before I got out."

The record reveals that Joe Robinson pled guilty to obstructing justice and aiding a fugitive for his participation in the instant crime. The record further reveals that the State agreed to reduce the murder charge against Robinson in exchange for his testimony against the defendant. At the defendant's trial, Robinson testified that

Newell, Burnett, Brian Page, "Pooky," and the defendant came to his house on the afternoon of January 11, 1988, in a gray limousine. Later that same day, the group got into a black limousine. Burnett was using the name Larry King. As the black limousine entered A.F. Hill Park, the defendant suggested that they rob the driver. Burnett put a sawed-off shotgun to the driver's head and ordered him out of the car. Brian Page took the defendant's stepson and left the park. The defendant then took the shotgun from Burnett, threw the limousine driver to the ground, put his foot on the driver's head, and ordered Burnett to take his wallet. Robinson stayed at the scene about three minutes and then met Brian Page on a street corner. Robinson then took the defendant's stepson to Robinson's apartment.

Sometime later, the defendant, Burnett, Newell, and Brian Page arrived at Robinson's house. According to Robinson, at that time he noticed that the defendant and Burnett each had a handgun, but that neither of them had the shotgun. As the group was leaving Robinson's residence, Robinson heard Burnett say to the defendant: "Duane, you shot the man twice in the head." The defendant replied: "So what, I did."

On cross-examination, Robinson stated that he had surrendered to the police on January 13 around 10 p.m., and had given a statement to Investigator Hernandez around 10:30 p.m. Robinson admitted that he had told Hernandez that when the limousine pulled into the park, he walked away and did not see or hear anything. He also admitted that he had told Hernandez that he did not see the defendant with a gun until the defendant came to his house and that he did not know anyone had been killed until he heard some remarks at his house.

Will County investigator Anthony Hernandez testified over defense counsel's objection that at 10:03 p.m. on January 13, Robinson had spoken with him about the murder in question. According to Hernandez, Robinson told him that after the limousine stopped at A.F. Hill Park, he, Brian Page, and the defendant's stepson went home. Robinson was not present when the driver was shot. About 20 minutes after Robinson left the scene, Burnett and Newell told Robinson that the defendant had shot the driver. A short time later, the defendant admitted the shooting to Robinson.

The defendant first argues on appeal that he was denied a fair trial because the trial court allowed Investigator Hernandez to testify to prior consistent statements that Joe Robinson had made on January 13. The defendant further contends that any motive on the part of Robinson to fabricate arose prior to the January 13 statement.

■ As a general rule, a witness may not be rehabilitated by ad-

mitting former statements consistent with his trial testimony. (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.) However, where it is charged that the testimony is recently fabricated or that the witness has some motive for testifying falsely, then a prior consistent statement may be admitted, but only if made before the motive to fabricate arose or before the effect of the account could be foreseen. (*People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335.) Furthermore, where a witness has been impeached by proof that he has made prior inconsistent statements, the State may bring out all the prior statements to qualify or explain the inconsistency and rehabilitate the witness. *People v. Klinkhammer* (1982), 105 Ill. App. 3d 747, 434 N.E.2d 835.

■ In the instant case, Robinson was impeached with a statement he made to Hernandez at 10:30 p.m. on January 13. Robinson's January 13 statement that he had not seen the defendant with a gun was inconsistent with his direct testimony that he had seen the defendant with a shotgun at the scene of the crime. The State's attempt to rehabilitate Robinson through the testimony of Investigator Hernandez established merely that Robinson was not present when the victim was shot. This statement was not inconsistent with Robinson's testimony on cross-examination. The witness had been impeached by proof that he had made a prior inconsistent statement, and the State simply brought out all of the prior statements to qualify or explain the inconsistency and to rehabilitate the witness. Therefore, we find that the trial court did not err in allowing this testimony into evidence. The amount of weight to be afforded each of the statements was a question for the jury to decide.

The defendant next argues that section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(2)), which provides for an extended-term sentence when the trial judge finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, is unconstitutionally vague. He relies on *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, in which the court found in a death penalty case that similar language in an Oklahoma statute was unconstitutionally vague.

■ We initially note that the defendant did not raise this issue in the trial court. However, we will consider the issue, since a constitutional challenge to a statute may be raised at any time. *People v. Bryant* (1989), 128 Ill. 2d 448, 539 N.E.2d 1221.

In *People v. Barnhill* (1989), 188 Ill. App. 3d 299, 543 N.E.2d 1374, the court found that the application of *Maynard* was limited to

death penalty cases. The court then found that the language of section 5—8—1(a)(1)(b) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(b)), which provides that the trial court may impose a sentence of life imprisonment if it finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, was not unconstitutionally vague. See also *People v. La Pointe* (1982), 88 Ill. 2d 482, 431 N.E.2d 344.

The defendant contends that *Barnhill* is distinguishable from the instant case because here the death penalty was an option available to the trial court, whereas in *Barnhill* the maximum sentence the defendant could receive was life imprisonment. He cites *People v. McDonald* (1989), 189 Ill. App. 3d 374, 545 N.E.2d 819, as support for the proposition that even though the death sentence was not ultimately imposed in the instant case, it was nevertheless a death penalty case.

■ We find that *Barnhill* and *La Pointe* are controlling here. Section 5—5—3.2(b)(2) is not unconstitutionally vague in nondeath penalty cases. Furthermore, we find that the defendant's reliance on *McDonald* is misplaced. The *McDonald* court held only that the ultimate fact of whether a defendant is sentenced to death does not determine whether a case is capital for the purpose of judging the admissibility of a victim impact statement. The rationale of *McDonald* does not extend to a trial court's decision of whether to impose an extended-term sentence based on the aggravating factor listed in section 5—5—3.2(b)(2), where the court has already determined that certain mitigating factors preclude the imposition of the death penalty.

The defendant next argues that the facts of this case do not support the trial court's finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. He relies on *People v. Kane* (1986), 140 Ill. App. 3d 928, 489 N.E.2d 500. The State, on the other hand, relies on *People v. Walker* (1985), 136 Ill. App. 3d 177, 483 N.E.2d 301, in support of its response that the extended term was properly imposed.

■ Similar factual scenarios were presented in *Kane, Walker*, and *La Pointe*. In all three cases, the defendants acted with premeditated, cold-blooded deliberation in deciding to kill and rob a cab driver by shooting him in the head or neck at close range. In both *Walker* and *La Pointe*, the courts found that the defendants' conduct constituted exceptionally brutal or heinous behavior indicative of wanton cruelty. The *Kane* court, on the other hand, found that the defendant's conduct was not brutal or heinous within the meaning of the statute. We find that the rationale of *Walker* and *La Pointe* is control-

ling. In reaching this conclusion, we note that *Walker* was decided by this court and *La Pointe* was decided by the Illinois Supreme Court. Thus, we are obliged to follow those cases. The record reveals that the instant defendant cold-bloodedly shot the victim twice in the head at close range without any provocation. Accordingly, we hold that the trial court did not err in imposing an extended-term sentence.

Lastly, the defendant contends that he should have been given 388 days of credit, instead of only 86 days, for the time he spent in custody between his arrest on the instant charges and the imposition of his sentence.

■■ ■ The record reveals that the defendant was serving another sentence on a parole revocation violation for all but 86 of the 388 days he spent in custody. A defendant is not entitled to credit against his sentence for time spent in custody as a result of an unrelated crime or parole violation. (*People v. Hope* (1986), 142 Ill. App. 3d 171, 491 N.E.2d 785.) Accordingly, we find that the defendant was not entitled to any additional credit.

The judgment of the circuit court of Will County is affirmed.

Affirmed.

WOMBACHER and SCOTT, JJ., concur.