THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RITA JO NITZ, Defendant-Appellant.

Fifth District   No. 5—89—0784

Opinion filed March 9, 1993.—Rehearing denied April 29, 1993.

Thomas Peters, of Murphy, Peters & Davis, of Chicago, for appellant.

Charles Garnati, State's Attorney, of Marion (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE CHAPMAN delivered the opinion of the court:

On September 21, 1989, a Massac County jury convicted Rita Nitz of the first-degree murder of Michael D. Miley. She was sentenced to natural life in prison.

On appeal, defendant argues (1) that she was not proven guilty beyond a reasonable doubt; (2) that she was denied a fair trial because the trial court refused to change venue and because the trial court made prejudicial statements to the jurors; (3) that she was denied effective assistance of counsel by her court-appointed trial attorney; (4) that the provision for a natural life term, section 5—8—1(a)(1)(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b)) is unconstitutionally vague; (5) that section 5—8—1(a)(1)(b) was unconstitutionally applied to her; and (6) that her sentence was excessive and an abuse of discretion. We affirm.

In considering defendant's challenge on the reasonable doubt issue, the relevant question is whether, after viewing the evidence in

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. All the evidence is considered in the light most favorable to the prosecution. *People v. Tye* (1990), 141 Ill. 2d 1, 565 N.E.2d 931.

Defendant was charged with first-degree murder for the shooting death of Michael D. Miley. Jurors heard the following testimony at defendant's trial. On April 9, 1988, Richard Kaiber of Carbondale and a group of his friends camped at an area called Rocky Comfort, which is just south of Crab Orchard Lake. Kaiber and about 10 to 15 other campers went to look at an abandoned car "to see what it was all about." While the campers were vandalizing the car, the trunk popped open and a headless body rolled out. The body was that of Michael D. Miley, who had been missing since April 6, 1988. The car belonged to the victim.

The victim, Michael Miley of Murphysboro, was 23 years old. He was a member of the Carbondale homosexual community, and he occasionally visited two places where homosexuals frequently gathered. Those places were Two Hearts, a Carbondale bar, and certain areas near Crab Orchard Lake. At Crab Orchard Lake, homosexuals congregated near a dam, known as the spillway, and its four adjacent parking lots.

Michael Miley's father described him as someone who would react verbally to intimidation. "He would be quick to tell someone," his father said, but he was not a fighter. To illustrate, a friend, Edwin Pierson, explained that once, in February 1988, he and Michael Miley were parked in one of the lots at Crab Orchard Lake when a four-wheel-drive truck shined a spotlight on them. Michael Miley followed the truck and returned about 10 minutes later, upset and angry.

The defendant, Rita, was married to Richard Nitz at the time of Michael Miley's death. They were married at Crab Orchard Lake near the area where homosexuals congregated. They also lived less than two miles from one of the parking lots where homosexuals gathered and socialized. Much of the testimony at Rita's trial related to Richard Nitz's hatred for homosexuals and Rita's largely silent adoption of his beliefs.

Mark Miley, the victim's brother, testified that he had had two "experiences" with Richard Nitz. The first of these experiences occurred in 1986 while he and a group of friends socialized at the Crab Orchard Lake parking lots. Richard Nitz approached Mark Miley and his friends and asked him if they were fags. A group of

people, including a woman, accompanied Nitz. The group was armed with baseball bats, chains, ice picks and other equipment. Mark Miley and his friends left, but they returned a short time later and found another friend's car vandalized. Richard Nitz and his friends were gone. Miley could not identify the woman, who was armed with an ice pick, as the defendant.

The second incident involved Richard Nitz and two other men at Crab Orchard Lake. After Richard Nitz broke a friend's radio, Mark Miley said Richard started "coming after" him. As Mark Miley drove away, Richard Nitz hit his windshield and rear side mirror with an aluminum baseball bat.

Another witness, Charlie Brookmyer, the defendant's brother, explained that Richard Nitz hated homosexuals and referred to them as faggots and in other derogatory terms. Because he never heard Rita object to Richard Nitz's characterizations, Charlie Brookmyer said he assumed Rita also did not like homosexuals.

Charlie Brookmyer testified that Rita had told him that she and Richard Nitz had run a gay man off of the road in the Crab Orchard Lake area. Another time Charlie Brookmyer accompanied Richard Nitz and Rita when they confronted a noisy group of suspected homosexuals at the Crab Orchard Lake parking lots. Rita, however, was not armed. On cross-examination, Charlie Brookmyer stated that he had never seen the defendant harass, intimidate or abuse gays or anyone else.

Both Richard Nitz and Rita were members of the Trog Club, which was organized by Richard Nitz, who was the head Trog. Rita was the Trogette. Trog is short for troglodyte, which Charlie said means prehistoric or cave man. Trog Territory was Richard and Rita's special place. It was the place where they were married, and it was also the area where homosexuals gathered to socialize. Members of the Trog Club went to Trog Territory and ran off gays.

A third witness, Betty Boyer, said that Rita did not object to harassing homosexuals. On the night Betty Boyer and her ex-husband met Richard Nitz and Rita, Boyer said, she and her ex-husband were invited to go harassing homosexuals by Richard Nitz.

Finally, Williamson County Deputy Sheriff Dale Almaroad testified that Richard Nitz had, in fact, been arrested for intimidation and assault on homosexuals. As Rita paid Richard Nitz' bail, she commented to Deputy Almaroad that she and her husband did not like living near where homosexuals congregate because "mosquitoes transmit other diseases and why couldn't they transmit AIDS."

Turning to the events of April 6, 1988, the evidence indicated that Michael Miley ate with his family, practiced with his church choir, and drove out to Crab Orchard Lake to socialize. He visited with two friends that night, Robby Buttry and Edwin Pierson.

At about 6 p.m. that night, Betty Boyer arrived at the Nitz trailer to babysit for Rita's son. She testified that Richard Nitz and Rita left about 6:30 p.m. for John Barwick's car lot in Carterville. When they returned about 30 minutes later, Rita walked into the house, took a gun off the top of the icebox, went back to the car and handed the gun to Richard Nitz, and they left again.

Shortly after 9 p.m., Richard Nitz and Rita returned to their trailer. Rita walked inside and Boyer stepped out on the trailer porch. About this time, another car pulled into the Nitz driveway, backed out, and parked on the road. Boyer said she then saw a third person, a man, standing on the driveway and Richard Nitz getting a baseball bat from the back seat of his Charger. Boyer turned to go inside the trailer just as Rita went outside.

Boyer moved to the window to watch. Boyer testified: "[Richard Nitz yelled] for him to get his fucking ass off of his property; that he wasn't nothing but a faggot, and if he didn't he was going to kill him." The man turned away. Richard hit him in the back of the head several times with a baseball bat. The man fell to the ground. Rita just stood and watched. Betty watched from inside the trailer, but she was afraid to try to help the man. Richard Nitz and Rita picked the man up and put him in the trunk of his own car. Richard Nitz drove away in Rita's Barracuda. Rita followed him in the victim's car.

Boyer did not hear from or see the Nitzes again until about 1 a.m. that morning. Richard Nitz called, said he had car problems, and asked Boyer to come after him and Rita. Boyer made arrangements for a neighbor to pick them up. Later, when Richard Nitz and Rita returned home, Rita went to bed while Richard tried to clean up the blood on the driveway.

Boyer admitted that she had not told this story to police until May 6, 1988, after she knew Richard Nitz had been arrested. She also admitted that in July of 1988 she was arrested for battery and spent the night in jail before charges were dropped.

On cross-examination, Boyer confirmed that her problems with Department of Children and Family Services (DCFS) had ended, but she denied that it was because of her statement and testimony in the Richard Nitz case. Boyer also confirmed that Rita was abused by Richard Nitz. Once, she said, after Rita got an order of protec-

tion against him, Richard Nitz came to the trailer and, with baseball bat in hand, threatened to smash up everything.

Boyer admitted that she suffered from poor eyesight before she got glasses in May 1988. Defense counsel also impeached Boyer with prior inconsistent statements.

Rita's former cellmate, Barbara Winkler, also testified for the prosecution. Winkler allegedly wrote two letters at Rita's insistence. The letters were an attempt to incriminate Betty Boyer and to discredit another potential adverse witness.

In an effort to keep testimony about these letters from the jury, the defense argued that the letters and the circumstances surrounding them should not be admitted unless the defense opened the door to them, because the letters were the basis of separate charges against Rita. The trial court concluded that the testimony concerning the alleged attempt to influence a witness or create evidence would be allowed for the limited purpose of finding a consciousness of guilt for the charged offense. A limiting instruction was given both before and after the following testimony of Barbara Winkler.

Winkler admitted writing a letter but said she did so only at the insistence of Rita, who provided the information. A letter said that Betty Boyer planned the murder with Richard Nitz in an effort to frame Rita because Boyer and Richard Nitz wanted Rita out of the way so that they could be together.

Winkler said she wrote the letter because Rita's gang "was going to get after [her]" if she did not. The gang was described as one that goes around hurting fags and lesbians for no reason. Winkler stated that after she wrote the letter, Rita told her that "her [she] and Richard beat this guy with a baseball bat and shot him in the head and hung him from a tree."

On cross-examination Winkler said that Rita repeated this story to her 20 to 30 times a day every day until she left, but that she was too scared to ask for any more details. Rita never told Winkler that either she or Richard had decapitated the victim. Cross-examination also revealed that Rita had accused Winkler of theft and that, after a shakedown, the stolen item was found in Winkler's possession.

The State offered a variety of physical and circumstantial evidence which tied Richard Nitz and Rita to the crime.

Rita bought a pistol, a model J22C .22-caliber Jennings, on March 24, 1988. In a search of the Nitz trailer, shortly after the murder, an empty gun box was discovered on top of the refrigerator. The gun has never been recovered.

An autopsy, performed by Dr. Beverly Tsai, determined that there were no injuries or wounds on the body. Dr. Tsai testified that even though the victim was decapitated, he died before decapitation. Dr. Tsai stated that the exact cause of death could not be determined. The lungs, however, were slightly pinkish red which Dr. Tsai said indicated carbon monoxide intoxication from being transported in the trunk of the car which had holes in the floorboard.

Sears and J.C. Penney charge cards, issued to Michael Miley, were used to charge a variety of items at Kentucky Oaks Mall, Paducah, Kentucky, on April 7 and 8, 1988. Four clerks testified that a man and a woman used Michael Miley's credit cards to purchase the items. The woman signed some of the sales receipts. The man was positively identified as Richard Nitz. The woman was not identified.

The items purchased with Michael Miley's credit cards April 7 and 8, 1988, included: a pair of size-six Reebok tennis shoes, a pair of USA Olympic tennis shoes, a Skiva multicolored bikini, women's bikini underwear, men's bikini underwear, two pairs of men's jeans and two Pioneer speakers.

Items which matched the sales slip records for Michael Miley's credit cards were recovered at the Nitz home during the search. In addition to the items listed above, other items seized during the search included: a plastic Sears sack, a wooden baseball bat taken from the back seat of Richard Nitz's Charger, 10 cassette tapes, a Sanyo FT526 AM/FM cassette deck, a knife, a gold-colored Timex watch taken from Rita's Barracuda, a shovel, and underwear boxes and containers from cloth items of merchandise. The cassette tapes and the gold-colored Timex watch were positively identified as Michael Miley's property. The Sanyo cassette player was not positively identified as Michael Miley's. It was, however, a match to the Sanyo instructions and paperwork found in the glove box of Michael Miley's car.

None of the fingerprints or palm prints recovered from the victim's car or from the Sanyo stereo matched either of the Nitzes or Michael Miley. No hairs were found on the baseball bat. Tests for blood on the baseball bat, shovel, and knife were negative. Tests revealed Type O human blood on the Timex watch. Michael Miley had Type O blood. Both Rita and Richard Nitz have Type A blood.

Rita was interviewed while police officers searched her home and the grounds surrounding it. Jackson County Deputy Sheriff Robert Burns spoke to Rita during the search. He testified that she made the following statements:

Some of the seized items were gifts from Betty Boyer. Boyer explained that she hit the lottery. These gifts included tennis shoes, a bathing suit, jeans and stuff.

The gun was in the box; she had seen it only a few days before.

She was afraid for her safety.

She did not know the credit cards were stolen. She had seen a Sears credit card and a billfold with some papers on her coffee table in the living room. The credit card had the name Mike on it.

A guy named Glen or Murphy had killed someone and left the body on the forest service route. He had taken property from the victim.

The victim had struggled and was taken into the woods where he would not be found, and something was done to conceal his identity.

The credit card was given to Richard by Danny Walker for some work Danny wanted done on his transmission. Danny got the card from Glen Murphy.

She was in Paducah at the J.C. Penney store and had signed the receipt, but she was not there when the stereo speakers were purchased.

She thought the murder occurred at Panther's Den or Cougar's Den, something with a name similar to a big cat.

Then, Sergeant Phil Sylvester testified that, just weeks before trial, Rita suggested that Michael Miley's head might be found near a field where she and Richard had stopped on the way to the mall. He testified that she again acknowledged accompanying Richard Nitz to Paducah. Michael Miley's head was not found.

The defense presented evidence that Rita and Richard Nitz had marital problems and that Rita had an order of protection against Richard. Two friends, Larry Brookmyer and Dean Brown, stayed with her to protect her until mid-February of 1988.

Ron Roach, a defense investigator, had interviewed Betty Boyer. During that interview, Roach said, Boyer admitted that the police officers investigating the murder threatened to arrest her if she did not give a statement. Boyer was questioned about the murder seven or eight times for three to four hours each time. One of the interrogations lasted six hours.

The defense also called Williamson County Sheriff's Sergeant Cindy Olson and Williamson County Jail Lieutenant Karen Clark to confirm that Rita had accused prosecution witness Barbara Winkler

of stealing a personal item and that the item was found in Winkler's possession.

On cross-examination, Olson and Clark described Rita as an extremely manipulative person. These witnesses also disclosed that Rita and Richard Nitz wrote to each other almost daily while they were in jail. On the outside of their letters, the Nitzes wrote "Love Forever, T and T, Trog Loves Trogette" and "Trogette Loves Trog."

The defense also offered the testimony of private investigator John Moore and Rend Lake College Professor Ed Heischmidt to illustrate that, based on her own testimony, Betty Boyer could not have actually seen the events she testified she saw. Using a scale diagram and a variety of measurements taken at the trailer, the defense demonstrated that Betty Boyer did not have a clear view of Michael Miley's vehicle. Even at the most advantageous position that she had described, the car was out of her line of view. Heischmidt also testified that, if Richard swung the baseball bat as Betty Boyer testified he did, blood should have spattered 360°, yet no bloodstains were found on the concrete. He admitted, however, that the bloodstains could have been completely obliterated by a combination of cleaning and the weather.

The prosecution rebutted this evidence with testimony from Sergeant Phil Sylvester. Sylvester took his own car to the Nitz trailer and looked out the window at it. He stated that he could see all but the rear 18 inches of the trunk. On cross-examination, however, he stated that Betty Boyer's placement of Michael Miley's car on the scale diagram was beyond her line of sight. He estimated the car's position for his own tests.

Rita testified in her own defense. Defense counsel asked her two questions.

"Q. *** [W]ere you at the Kentucky Oaks Mall with Richard Nitz on April the 7th and 8th of 1988?

A. Yes, he made me go with him.

Q. *** [D]id you participate in any way in the death of Michael Miley?

A. No, I did not."

These two questions opened Rita to extensive cross-examination. She gave the following account of the circumstances surrounding Michael Miley's murder.

At 6 p.m. April 6, 1988, Rita was doing laundry at Chuck Hooker's trailer. She finished about 8:30 p.m. On her way home she stopped at the Veach Station behind Carbondale Mall. She was ac-

companied by Richard Nitz and her son. Richard talked to Chuck Hooker and then drove her and her son home. She gave her son his medicine and he went to bed. Richard unloaded the laundry.

Richard was mad because Betty Boyer had borrowed his car and had not returned it. He went to get the car. He returned to borrow gas money and left again.

Richard returned about 2 or 3 a.m. He wanted help because his car was stuck and Rita went to help. In the area where the car was stuck, she noticed a wet spot on the ground. Richard said it was blood. As he kicked dirt over it, she noticed what appeared to be blue jeans sticking out of a pile of leaves. She also saw a vehicle. Richard asked if she had ever seen a dead body.

Not until April 28, 1988, did she believe that this incident might have something to do with the Michael Miley murder. She did not go to the police then because she was not sure what happened. Glen Murphy, an acquaintance of Rita and Richard, admitted to a murder, but he did not say it was Michael Miley. She thought it was a scare tactic. She did tell police she was suspicious of something.

On April 7, 1988, Richard drove her to Kentucky Oaks Mall in Paducah, Kentucky. She went only because Richard was threatening her. When they got to the mall, she went along because, she said, it was "either be there or be deserted somewhere, where I didn't know where." She participated in the purchases only because Richard threatened her. She knew the credit card had the name Michael on it, but she thought Richard had the card issued in her son's name.

On April 8, 1988, Richard held a knife to her throat to convince her to join him on his trip to Paducah. On the way, they stopped at a little field where Richard looked around and picked up a knife.

Rita said that at the mall, basically, she was "just along with him." Richard pulled her along, telling her that if she did not do what he said, he would make sure that he did not go down alone. She does not remember buying any shoes. Richard bought women's shoes. However, she might have been wearing those shoes when the police searched her trailer. She was not present when the speakers were purchased, but she did remember signing Michael Miley's name to the credit slip.

Rita admitted that the first time she told law enforcement officials about stopping near a field on the way to Paducah was August 9 or 11, 1989. She denied she wanted a deal for the head of Michael Miley.

Rita divorced Richard Nitz prior to her trial.

## I

Defendant argues that the foregoing evidence is insufficient to prove her guilty beyond a reasonable doubt. First, she contends that the prosecution did not offer any physical evidence that the victim was shot. Second, she argues that the State failed to prove that she was legally responsible for Richard Nitz's acts. Third, she contends that the testimony of Betty Boyer and Barbara Winkler was of little value and did not prove her guilty beyond a reasonable doubt.

Defendant correctly contends that no physical evidence supports the prosecution's theory that the victim was shot in the head. In fact, the record reveals that very little evidence supports this theory. The prosecution attempted to introduce defendant's admissions through her cellmate, Barbara Winkler. Winkler testified that the defendant told her that she and Richard "shot" someone. However, because this evidence was tied to charges that defendant attempted to influence or harass this witness, the trial judge admitted this testimony for the limited purpose of showing consciousness of guilt. Consequently, the State presented no evidence, that was generally admitted, to prove there was a shooting.

This does not, however, dispose of defendant's murder conviction. Defendant does not argue directly that there was a fatal variance between the allegations in the indictment and the proof presented at trial. But, resolution of this issue bears directly on defendant's argument that she was not proven guilty beyond a reasonable doubt because the prosecution did not prove the victim was shot.

Essential allegations in an indictment or an information must be proven without variance and cannot be inferred. (*People v. Clark* (1979), 71 Ill. App. 3d 381, 389 N.E.2d 911.) An allegation as to the means used to accomplish death is not an essential part but rather a formal part of the indictment. (*People v. Coleman* (1971), 49 Ill. 2d 565, 571, 276 N.E.2d 721, 724.) The State is under no duty to prove the identity of the weapon used. *People v. Carter* (1978), 57 Ill. App. 3d 84, 372 N.E.2d 1093.

In *People v. Coleman*, the defendant argued that an allegation of the means used to murder his wife was not a formal defect and could not be changed by amendment. Over his objection, the State amended its original indictment to charge him with murder either by stabbing or by asphyxiation. (*Coleman*, 49 Ill. 2d at 569, 276 N.E.2d at 723.) In upholding the trial court, the supreme court said

that the defendant was adequately informed of the gist of the offense with which he was charged, *i.e.*, murder of his wife. It also noted that the amended indictment did not raise the possibility that defendant could be tried twice for the same crime and that the defendant was not prejudiced. *Coleman*, 49 Ill. 2d at 570, 276 N.E.2d at 724.

■ This analysis is equally applicable in the instant case. The indictments adequately informed defendant that she was charged with the murder of Michael Miley. The prosecutor's evidence proved she participated in the murder of Michael Miley. The variance in the language of the charge and the proof raises no possibility that she could be tried twice for this crime. Similarly, she can show no prejudice as a result of being proven guilty of a murder for which she was charged, notwithstanding the fact that the State failed to prove the instrumentality of death. The defendant can show no prejudice in this case because she did not rely on the State's theory of the method of the murder to prepare her defense. Her defense was that she was not present during the murder. Had the jury believed her story, she would have been acquitted regardless of the method used to murder Michael Miley.

Consequently, defendant's argument that she was not proven guilty beyond a reasonable doubt because the prosecution did not present any physical evidence of a shooting fails. The prosecution presented sufficient evidence to prove defendant guilty of murder beyond a reasonable doubt. The prosecutor proved that defendant helped load the battered Michael Miley into the trunk of his own car and that she drove him away. Betty Boyer testified that defendant alone drove away in the victim's car with the victim locked in the trunk. The victim's car, containing his headless corpse, was discovered three days later. The testimony of pathologist Dr. Beverly Tsai supports the prosecution's theory that Michael Miley was alive when he was first placed in the trunk.

The prosecution also presented sufficient evidence to prove defendant guilty beyond a reasonable doubt on an accountability theory. Defendant was accountable for Richard Nitz's conduct if:

> "Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, [s]he solicit[ed], aid[ed], abet[ted], agree[d] or attempt[ed] to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).

The law on accountability incorporates the "common-design rule." This rule provides that where two or more people engage in

a common criminal design, any acts in furtherance of the criminal design committed by one party are considered to be the acts of all parties to the criminal design. (*People v. Fyke* (1989), 190 Ill. App. 3d 713, 720, 546 N.E.2d 1101, 1106.) The State's evidence characterized defendant as Richard Nitz's silent partner in an overall plan, scheme or design to harass and intimidate homosexuals. In addition, the defendant admits that on the two days following Michael Miley's death, she joined Richard Nitz on a spending spree with the victim's credit cards. Taking this evidence in the light most favorable to the prosecution, we conclude that the trier of fact could have found defendant guilty beyond a reasonable doubt on an accountability theory.

Finally, the inconsistencies between Betty Boyer's testimony and her prior sworn statements may make her a less credible witness, but they do not create reasonable doubt. A reviewing court will not substitute its judgment as to the weight of the disputed evidence. (*People v. Herrett* (1990), 137 Ill. 2d 195, 206, 561 N.E.2d 1, 6.) Rather, the level of witnesses' credibility, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*People v. Tye* (1990), 141 Ill. 2d 1, 13, 565 N.E.2d 931, 937.) A criminal conviction will not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*Tye*, 141 Ill. 2d at 13, 565 N.E.2d at 937.) The inconsistencies in Boyer's testimony did not make her statements so unbelievable that the State's proof became improbable or unsatisfactory. A rational jury could have found Rita Nitz guilty of murder beyond a reasonable doubt. The evidence is sufficient to support the jury's verdict.

## II

Defendant next complains that the trial court erred when it denied her pretrial and post-trial motions for a second change of place of trial. She contends that, although her trial was transferred to Massac County from Williamson County, she was denied a fair trial or an impartial jury.

On March 8, 1989, at her motion-to-change-venue hearing, defendant presented evidence that area media published a substantial number of stories about the Michael Miley murder and Richard Nitz's trial and sentencing. In the nearly 11 months after Michael Miley's body was discovered, The Southern Illinoisan published about 44 stories covering those events. The Southern Illinoisan cir-

culates in Johnson, Perry, Randolph, Franklin, Jefferson, Union, Williamson and Jackson Counties. The West Frankfort Daily American and the Marion Daily Republican each published between 20 and 30 prominently displayed stories, some with photographs of the defendants. These newspapers circulate in Franklin and Williamson Counties and part of Johnson County. Representatives of the three major television network affiliates testified that they also aired stories about the Miley murder, Richard Nitz's trial, and his sentencing. The number of stories aired on area television totalled more than 120. These three television stations covered all of southern Illinois. All media representatives agreed that their concentrated coverage of these events ended about four months earlier when Richard Nitz was sentenced.

Transferring defendant's trial to Massac County eliminated or mitigated the danger that potential jurors were or would be exposed to print media coverage of the Michael Miley murder, the Richard Nitz trial, and the Rita Nitz trial. Nevertheless, defendant argues that the volume of pretrial publicity deprived her of a fair trial with an impartial jury.

The issue, however, is not the amount of publicity surrounding a certain case, but whether the defendant received a fair and impartial trial. (*People v. Lego* (1987), 116 Ill. 2d 323, 334, 507 N.E.2d 800, 803.) The defendant is entitled to a change of place of trial if the court has reasonable grounds to believe that prejudice against the defendant actually exists and that, by reason of this prejudice, there is a reasonable apprehension that defendant cannot receive a fair trial. (*People v. Boyle* (1987), 161 Ill. App. 3d 1054, 1070, 514 N.E.2d 1169, 1170.) A change of place of trial should be granted when it is apparent that it will be impossible to find 12 jurors sufficiently unfamiliar with the details of the case to withstand a challenge for cause. (*People v. Olinger* (1986), 112 Ill. 2d 324, 343, 493 N.E.2d 579, 588-89.) The decision to grant a change in place of trial is discretionary and will not be reversed absent an abuse of discretion. *Boyle*, 161 Ill. App. 3d at 1070, 514 N.E.2d at 1170.

■ In the instant case, it is undisputed that a substantial amount of publicity followed the discovery of Michael Miley's headless corpse and that it continued through Richard Nitz's trial. Only 3 of the 12 jurors had not heard or read anything about these events. However, the bulk of this publicity preceded the commencement of defendant's trial by almost five months. And, each juror selected indicated that he or she had no preconceived notions about the defendant's guilt or innocence.

A juror need not be totally ignorant of the facts and the issues involved so long as he or she can lay aside any impressions and render a verdict based on the evidence presented. (*People v. Black* (1972), 52 Ill. 2d 544, 557, 288 N.E.2d 376, 384.) Each juror selected in this case indicated that he or she could do just that. In light of these facts, the trial court did not abuse its discretion when it denied defendant's motion to transfer her trial from Massac County.

If the pretrial publicity alone is insufficient to prejudice her, the defendant argues that she was denied a fair trial by the publicity coupled with the fact that the trial court informed each juror that her husband, Richard Nitz, was convicted of the same crime. In fact, defendant's attorney asked the trial court to ask prospective jurors whether Richard Nitz's conviction would prejudice them against the defendant. An accused may not request the court to proceed in a certain manner and then assign as error the ruling on the action that she procured. *People v. Hill* (1987), 154 Ill. App. 3d 214, 219, 507 N.E.2d 174, 177.

### III

Defendant argues that her attorney was ineffective and that she is entitled to a new trial because trial counsel failed to object to the trial court's and the prosecution's statements informing the jurors that Richard Nitz was convicted of the same crime. She also criticizes his failure to object to evidence that Richard Nitz hated homosexuals and his failure to object to the introduction of a bat, knife, and shovel when no evidence showed that these items were related to this crime.

Defendant was denied her constitutionally guaranteed right to counsel if she can prove both that her attorney's performance was so deficient that it fell below an objective standard of reasonableness and that she suffered substantial prejudice as a result of these deficiencies. *People v. Pecoraro* (1991), 144 Ill. 2d 1, 13, 578 N.E.2d 942, 947, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

■ Defendant cannot show that the outcome of the trial would have been different had trial counsel objected to references to Richard Nitz's conviction, his hatred of homosexuals, and the bat, knife, and shovel as evidence. (*Pecoraro*, 144 Ill. 2d at 13, 578 N.E.2d at 947 (a court may dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice before reaching the deficiency analysis).) Trial counsel requested that prospective jurors be

*voir dired* about any potential prejudice toward defendant because her husband was convicted of the same crime. Apparently, this was part of trial counsel's overall plan to admit that Richard Nitz committed the crime but argue that defendant was not a participant in it. Such a strategy is not inconsistent with defendant's own testimony. She testified that she was not present during the murder.

Defendant's final two claims of ineffective assistance of counsel for failure to object are also matters of trial strategy. An unsuccessful strategy does not render trial counsel's representation constitutionally defective.

■■ Defendant further argues that she received ineffective assistance of counsel because trial counsel failed to adequately cross-examine Betty Boyer and because he did not argue in his closing argument that if Betty Boyer were believed then the victim was dead before defendant ever touched him. The second argument is meritless. Defendant testified she was not even present when Michael Miley was murdered. Her trial counsel cannot be called ineffective because he failed to argue to the jury that if it believed defendant lied, then it should find that the victim was dead before she helped load him into the trunk of his own car. Trial counsel's closing argument was consistent with his client's testimony. There is nothing objectively deficient or prejudicial about that.

There is also nothing deficient about trial counsel's cross-examination of Betty Boyer. Defendant contends that trial counsel could have damaged Boyer's credibility by demonstrating that she testified under oath to two different time frames regarding defendant and Richard Nitz's return home. A review of trial counsel's cross-examination of Boyer reveals that he adequately impeached her testimony. He succeeded in conveying to the jury that Boyer earlier testified to a different time frame regarding when defendant and Richard Nitz returned home.

In addition, trial counsel demonstrated inconsistencies in Boyer's statements about whether defendant's son was home from school the day of the murder; whether Richard or Rita got the keys to the victim's car; where the defendant and Richard went when they first left their home; where the cars were parked; and how many times the victim was hit. He also brought out testimony that Boyer had poor eyesight and no glasses at the time and that she gave her statement only after threats by the interrogating officers. Overall, defendant's trial counsel vigorously cross-examined Boyer. His representation was not deficient, and defendant was not preju-

diced because he failed to drive home one point as forcefully as she would have liked.

## IV

Defendant next challenges her sentence. She argues that her sentence must be vacated because the natural life sentencing provision (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)(b)) is unconstitutional on its face and was unconstitutionally applied to her. Section 5—8—1(a)(1)(b) gives the sentencing judge discretion to impose a natural life term if the court finds the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Defendant asserts that this sentencing provision is unconstitutional because it fails to provide any meaningful guidance on how to impose a natural life sentence.

■■ This court held section 5—8—1(a)(1)(b) constitutional in *People v. Barnhill* (1989), 188 Ill. App. 3d 299, 543 N.E.2d 1374. Defendant encourages us to reconsider that decision. We decline to do so. The definitions of brutal, heinous and cruel are commonly understood and provide sufficient warning and understanding as to the type of murder which qualifies for imposition of a natural life sentence. (*People v. Barnhill* (1989), 188 Ill. App. 3d 299, 543 N.E.2d 1374.) These common definitions together with this court's decision in *Barnhill* and the supreme court's decision in *People v. LaPointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, provide sufficient guidance to a judge considering a sentence pursuant to section 5—8—1(a)(1)(b).

In addition, section 5—8—1(a)(1)(b) was not unconstitutionally applied to defendant. A natural life term may be imposed if the court finds that the murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." The defendant contends that the trial court improperly weighed two factors when it sentenced her to a term of natural life. The two factors were that the murder did not take place quickly and that defendant went on a shopping spree following the murder.

The record demonstrates, however, that the trial judge considered far more than how quickly death came to the victim and the defendant's subsequent shopping spree. For example, the trial court considered the fact that defendant was intelligent and had opportunities to withdraw from the crime but chose not to do so. He also noted that the defendant displayed a total lack of remorse and a total lack of respect for the system, and that the murder was cold and calculated.

The trial judge in this case properly considered all the facts surrounding the incident in evaluating the heinousness of the defendant's conduct. (*People v. Sullivan* (1989), 183 Ill. App. 3d 175, 538 N.E.2d 1376.) A natural life sentence was not arbitrarily imposed upon the defendant.

## V

Defendant also asserts that this sentencing scheme is unconstitutional when the natural life sentencing provision is considered in light of the extended-term sentencing provisions of section 5—5—3.2(b)(2). (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(2).) She contends that this sentencing scheme gives judges no guidance when choosing between a natural life term and an extended-term sentence. Consequently, she argues that she was denied due process and equal protection under the law.

■ Defendant correctly points out that the language which triggers imposition of an extended term is identical to that which makes a defendant eligible for a natural life term. (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—5—3.2(b)(2), 1005—8—1(a)(1)(b).) A court may sentence a defendant guilty of murder to a natural life term or a prison term of not less than 60 years and not more than 100 years if it finds "the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—5—3.2(b)(2), 1005—8—1(a)(1)(b), 1005—8—2(a)(1).) The statutes do not dictate when a natural life sentence should be selected over an extended-term sentence. That omission alone, however, does not automatically render this sentencing scheme unconstitutional.

In fact, Illinois courts have upheld these statutes against similar constitutional attacks. (*People v. Cartalino* (1982), 111 Ill. App. 3d 578, 444 N.E.2d 662; *People v. Whitlock* (1988), 174 Ill. App. 3d 749, 528 N.E.2d 1371.) *Cartalino* held that because a court must consider both aggravating and mitigating factors before imposing any sentence, the circuit court does not have unbridled discretion to sentence a defendant to natural life or an extended term. The presence or absence of mitigating factors determines the nature of the sentence imposed on a defendant found guilty of a brutal and heinous murder. *Cartalino*, 111 Ill. App. 3d at 592, 444 N.E.2d at 673.

We adopt the *Cartalino* court's analysis and conclude that this sentencing scheme is constitutional. Defendant was not denied due process or equal protection simply because the trial court could choose between sentencing her to a term of natural life and an ex-

tended term. The trial court adequately considered factors in mitigation and aggravation before imposing the natural life term.

## VI

Finally, defendant argues that a term of natural life is excessive and an abuse of the trial court's discretion. She contends that because of her limited involvement, her rehabilitative potential, and her lack of prior criminal convictions, her sentence should be reduced or vacated and remanded for resentencing.

The standard of review of a sentence claimed to be excessive is whether the trial court exercised its discretion and, if so, whether this discretion was abused. (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541, 545.) The trial court is normally in a better position to determine the punishment to be imposed than the courts of review. *Cox*, 82 Ill. 2d at 280, 412 N.E.2d at 547.

At the sentencing hearing, the trial judge said that he had reviewed the presentence investigation report and that he had taken judicial notice of the entire trial proceedings. He also listened to oral arguments regarding sentencing.

In looking at the factors in aggravation and mitigation, the trial court concluded that the evidence did not support defendant's contention that she acted under a strong provocation or that there were substantial grounds tending to excuse or justify her conduct though failing to establish a defense. He also concluded that her conduct was not the product of circumstances unlikely to recur, noting that the evidence showed that the circumstances had occurred before. He found that the fact that defendant had no prior criminal convictions was the only criterion in mitigation.

In aggravation, the trial court found that defendant had a history of criminal activity. He specifically noted that she tried to create evidence favorable to her. He also stated that the sentence was necessary to deter others from committing the same crime.

■■ The trial court judge carefully considered each of the applicable factors in aggravation and mitigation in this case. He did not abuse his discretion by sentencing defendant to a term of natural life.

The defendant's conviction for the murder of Michael Miley and her sentence to a term of natural life are affirmed.

Affirmed.

RARICK and LEWIS, JJ., concur.